UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**NOT FOR PUBLICATION**

------------------------------------------------------------x

In re:

ACTRADE FINANCIAL TECHNOLOGIES
LTD., et al.,

Chapter 11

Case Nos. 02-16212 (ALG)
and 02-16213 (ALG)
(Jointly Administered)

                    Debtors.

------------------------------------------------------------x

ACTRADE LIQUIDATION TRUST, as
Successor in Interest to ACTRADE CAPITAL
INC.,

                    Plaintiff,

        - against -

Adv. No. 05-03657 (ALG)

HLC INDUSTRIES, INC. and
EMANUEL LANDAU,

                    Defendants.

------------------------------------------------------------x

### MEMORANDUM OF OPINION

A P P E A R A N C E S:

SALISBURY & RYAN, LLP
Attorneys for Plaintiff
    By:  Patrick P. Salisbury, Esq.
1325 Avenue of the Americas
Suite 794
New York, NY 10019

WOLF, BLOCK, SCHORR AND SOLIS-COHEN, LLP
Attorneys for Defendants
    By:  Amy Onder, Esq.
250 Park Avenue
New York, NY 10177
    By:  Michael L. Temin, Esq.
1650 Arch Avenue
Philadelphia, PA 19103

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Introduction

Actrade Capital Inc. (the "Debtor" or "Actrade") and Actrade Financial Technologies LTD filed for chapter 11 protection on December 12, 2002, and their Second Amended Plan of Liquidation was confirmed on January 6, 2004. The Actrade Liquidation Trust is the Debtor's successor in interest, and Jonah Meer is the current liquidation trustee. Actrade's business was providing commercial financing through the issuance of a check-like instrument called a Trade Acceptance Draft ("TAD"). Under the TAD program, a buyer of goods could issue the seller a TAD and obtain deferred unsecured payment terms of up to 180 days. Actrade would make immediate payment to the seller for the full invoice amount (less Actrade's fee) by purchasing the TAD from the seller, and then present the TAD to the buyer for payment. Actrade's relationship with the parties was governed by contracts entered into separately with the buyer and the seller (collectively, the "Contracts").

HLC Industries Inc. ("HLC"), of which Emanuel Landau ("Landau") was chairman of the board and controlling shareholder, sold camouflage material to Terry Manufacturing Company ("Terry"). Terry in turn manufactured and sold garments to the military. It appears that in 2001, due to Terry's repeated overextension of its line of credit, HLC required that Terry reduce its outstanding receivables prior to receiving further shipments. In October 2001, Terry entered into a Buyer Letter of Understanding with Actrade (the "Buyer Contract"), and in February 2002 Actrade entered into a

2

Supplier Letter of Understanding (the "Supplier Contract") with HLC. HLC continued shipping material to Terry, and from February 2002 until May 2003 HLC sold to Actrade the TADs that Terry issued for the purchase of product. Each time HLC sold a TAD to Actrade, HLC executed and delivered to Actrade a Bill of Sale and Assignment that related to a specific TAD and further represented, "[t]he foregoing Bill of Sale and Assignment shall be subject to the provisions of a certain Supplier Letter of Understanding relating to Actrade's TAD Program between Supplier [HLC] and Actrade." In connection with its purchase of the TADs, Actrade also asserts that it was provided with copies of the invoices issued by HLC to Terry, on HLC's invoicing form.

Terry filed for chapter 11 protection on July 7, 2003. At that time, Actrade held roughly $1.5 million of TADs (the "Unpaid TADs") which it had bought from HLC. Unable to satisfy this debt due to Terry's bankruptcy, Actrade made a claim on its insurer, National Union Fire Insurance Company of Pittsburgh (the "Insurer"), which paid Actrade roughly $800,000 on account of the Unpaid TADs. On March 22, 2004, the former trustee of the Actrade Liquidation Trust executed a Release and Assignment Agreement (the "Release") in favor of the Insurer.[1] In late 2005 Actrade brought this action against the Defendants to recover the moneys it had paid HLC for the Unpaid TADs, and on April 12, 2006, the Debtor filed its First Amended Complaint (the "Complaint").[2]

In the Complaint, Actrade alleges that HLC breached the Supplier Contract and that Defendants breached certain duties and defrauded it in connection with the transactions. The Supplier Contract provided, *inter alia*, that

---

[1] The terms of the Release are discussed below.
[2] This case was initially brought as part of the Terry bankruptcy proceeding in Alabama and was transferred to this Court.

3

> [A]ny TAD offered for sale to Actrade must have been duly issued and delivered to [HLC] by [its] customer as payment for the actual sale of goods and/or services, in a bona fide contemporaneous commercial transaction entered into between [HLC] and [its] customer.

It is Actrade's position that this provision prohibited HLC from tendering to Actrade any TAD that was related to an invoice more than 90 days overdue, and that this "90 day rule" was explicitly agreed to by the parties. Actrade alleges in the Complaint that the Defendants backdated overdue invoices in order to make it appear that the associated TADs were issued within the 90-day period, and then proceeded to sell these TADs to Actrade. Count One of the Complaint alleges breach of contract by HLC, Count Two claims interference with contract by HLC and Landau, Count Three charges misrepresentation by HLC and Landau, Count Four claims negligent misrepresentation by HLC and Landau, and Count Five is a cause of action based on conspiracy to defraud. The Defendants have denied the allegations of the Complaint and have asserted twelve affirmative defenses.

Before the Court is Defendants' motion for summary judgment, based on three grounds. First, Defendants move for judgment on all five counts arguing that as a consequence of Actrade's issuance of the Release to the Insurer, it is no longer the real party in interest under Fed. R. Civ. P. 17 and cannot pursue this action. Second, Defendants move for summary judgment as to Counts Two, Three, Four, and Five, arguing that these counts are barred under New York's "economic loss doctrine," which bars tort claims based entirely on a breach of contract.[3] Last, Defendants move for summary judgment on Count Four by arguing that Actrade has not alleged the necessary fiduciary relationship between HLC and Actrade to support a claim of negligent

---

[3] The Supplier Contract included a choice of law provision providing that New York law would govern the contract, and the parties do not dispute that New York law applies.

4

misrepresentation. For the reasons stated below, HLC's motion for summary judgment is denied as to Counts One, Two, Three, and Five, and granted as to Count Four.

## Discussion

Standards for Granting Summary Judgment

The principles that govern summary judgment motions are well-known. In accordance with Bankruptcy Rule 7056, which incorporates Fed. R. Civ. P. 56, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *see also Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.*, 161 B.R. 87, 89 (S.D.N.Y. 1993). When a court considers a motion for summary judgment, it must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1318 (2d Cir. 1975); *see also Ames Dep't Stores, Inc*., 161 B.R. at 89. However, a party opposing a motion for summary judgment cannot rest on its pleadings but must provide evidence to support the essential elements of its case. *See Anderson*, 477 U.S. at 248; *DePippo v. Kmart Corp.*, 335 B.R. 290, 294-95 (S.D.N.Y. 2005), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

5

Real Party in Interest

Fed. R. Civ. P. 17, incorporated by Bankruptcy Rule 7017, provides that "[e]very action shall be prosecuted by the real party in interest." Defendants contend that as a consequence of Actrade's execution of the Release, it is no longer the real party in interest.

Actrade's first response is that the Release only affected claims that it had against Terry, not against the Defendants. The Release provides:

> [t]he Insured does hereby assign, transfer and set over to the Company [the Insurer], their successor and assigns, without recourse, representation or warranty other than as set forth herein, all sums of money now due, or to become due from the Buyers [Terry] in respect to any distributions received in respect of the Claims in accordance with paragraph 2 hereof, and any and all contracts, security and evidences of indebtedness relating thereto, to have and to hold the same, with the full power to collect and enforce the same, for their own use and benefit by any action or proceeding in the name of the Insured or otherwise; and to take all legal steps as they deem proper and necessary in connection herewith, and the Company and insured agree to share recoveries as provided for in the terms and conditions of the policy.

Insofar as the Release transfers rights to the Insurer, it does so as to claims that the insured has against the "Buyers," which in this case is Terry. No party has asserted that there exists a separate release involving Actrade's claims against the Defendants, and the Release does not by its express terms cover Actrade's claims against these Defendants.

An insured may also lose its status as the real party in interest once it has been paid by an insurer for its claims. However, where an insurer pays an insured in part, such as where the insured must first meet a deductible, the insured party remains a party in interest for purposes of Rule 17. *See United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 380-382 (1949); *Brocklesby Transp. v. E. States Escort Services*, 904 F.2d 131, 133 (2d Cir. 1990). New York law is the same. *See Henderson v. Park Cent. Motors*

6

*Serv., Inc.,* 138 Misc. 183, 185, 244 N.Y.S. 409 (Sup. Ct. N.Y. Co. 1930). Here, due to the deductible and a 90% cap in Actrade's policy, the Insurer only paid it approximately $800,000, although Actrade allegedly sustained a $1.5 million loss on account of the Unpaid TADs. Moreover, Actrade also has a separate agreement with the Insurer under which it retains a financial interest in any recovery from this action. Actrade is a real party in interest and may appropriately pursue this action.[4]

The Tort Claims as Allegedly Duplicative of the Contract Claims

The Defendants' second ground for seeking summary judgment is that each of Counts Two through Five of the Complaint is a tort under New York law, and "[e]ach cause of action arises from the same factual background and claims the same damages" as the breach of contract claim asserted in Count One of the Complaint. The Defendants assert that New York law does not recognize a tort claim where the tort is merely duplicative of the contractual cause of action and only economic damages are sought. Actrade responds that New York state courts have never applied the "economic loss doctrine" to intentional torts, that the doctrine is not applicable in any event, and that it does not apply in any case to the claims against defendant Landau, who was not a party to the contract.

As the Second Circuit has held, under New York law, where a fraud claim is "premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie.'" *Bridgestone/Firestone,*

---

[4] Rule 17 further provides that "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for…joinder or substitution of, the real party in interest…" Thus, even if Actrade were not the real party in interest, it would not be grounds for dismissal of the action.

7

*Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996), citing *McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991); see also *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996); *Metro. Transp. Auth. v. Triumph Adver. Prods.*, 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dep't 1986). To maintain a tort claim in addition to a claim of breach of contract, a plaintiff must (i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and not recoverable as contract damages. *Bridgestone/Firestone, Inc.*, 98 F.3d at 20. In that case, the Circuit Court dismissed tort claims against a corporation and its principal, finding that the misrepresentations "amount to little more than intentionally-false statements by [the principal] indicating his intent not to perform under the contract. That is not sufficient to support a claim of fraud under New York law." *Id*. at 19-20 (citations omitted).

The Amended Complaint, however, does not merely charge the Defendants with misrepresenting their intentions with respect to performance of the contract. Defendants are charged not only with wrongdoing relating to the Supplier Agreement, which was the contract between the Plaintiff and HLC. Defendants are also charged with tortious actions relating to the Buyer Contract between Terry and Actrade. For example, the Second Count of the Amended Complaint alleges that Defendants tortiously interfered with the Buyer Contract between Actrade and Terry. Asserting that Defendants knew that Terry was issuing TADs on the basis of backdated or false invoices, Actrade contends that Defendants assisted Terry in breaching the Buyer Contract and that

8

Defendants are liable for damages "as a result of such interference" with the Buyer Contract. Whether or not Actrade can make out a case of tortious interference with contract rights at trial, the Complaint asserts claims that are collateral to the cause of action alleging breach of the contract between Actrade and HLC, and Actrade's Second Count will not be dismissed on the ground of the economic loss doctrine. *See S & S Hotel Ventures Ltd. v. 777 S.H. Corp.*, 108 A.D. 2d 351, 489 N.Y.S. 2d 478 (1st Dept. 1985).[5]

Count Three claims fraud in connection with the submission of backdated invoices to Actrade. To the extent these claims relate to Terry's submission of documentation to Actrade under the Actrade-Terry contract, they would, if proven, constitute a misrepresentation collateral or extraneous to the Actrade-HLC contract, within the *Bridgestone/Firestone* analysis. *See also Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88 (1986), described by *Bridgestone/Firestone* as "refusing to dismiss [a] fraud claim alleging 'a misrepresentation'" which was "'collateral to, but which was the inducement for the contract' and thus not duplicative of [the] contract claim." 98 F.3d at 21-22. It may be that Actrade will have difficulty proving that the Defendants defrauded it in connection with the Actrade-Terry contract in that they will have to show that Defendants made representations on which Actrade relied in connection with that agreement. However, Defendants have moved to dismiss Count Three on the basis of the economic loss doctrine without any effort to set forth the facts of a typical transaction and to show that they made no representations outside of the Supplier Contract and the transmittal of

---

[5] Paragraph 35 of the Amended Complaint, however, charges Landau with causing HLC "to breach the Supplier Agreement." This claim is clearly insufficient under the analysis in *Bridgestone / Firestone*.

9

documents in connection therewith. Based on the papers before the Court, the motion fails.[6]

As to Count Five for conspiracy to defraud, "[a]n allegation of conspiracy to defraud can lay only if there is an existing underlying cause of fraud." *Crigger v. Fahnstock & Co.*, 443 F.3d 230 (2d Cir. 2006). As this Court has found that that the underlying cause of fraud is sufficiently collateral to the obligations incurred under the Contract, Count Five survives HLC's motion for summary judgment as well. *See also Florida Dep't of Ins. v. Debenture Guaranty,* 921 F.Supp. 750, 756 (M.D. Fla. 1996) (so long as an underlying cause of action for fraud survives in light of the economic loss doctrine, a conspiracy to defraud cause of action survives as well).

Count Four: Negligent Misrepresentation

In Count Four, Actrade also claims damages for negligent misrepresentation, asserting in connection therewith that Defendants "owed a duty of care" to Actrade with respect to statements made by HLC to Actrade regarding Actrade's purchase of the Unpaid TADs. Actrade further alleges that there was a "special relationship" between Actrade, HLC, and Terry and that HLC had "unique and specialized knowledge" concerning the Unpaid TADs. In addition to the grounds discussed above, Defendants seek summary judgment as to this Count on the ground that there was no fiduciary or special relationship between Actrade and HLC, a necessary element of the tort of negligent misrepresentation.

---

[6] The parties dispute whether the economic loss doctrine in New York law bars a cause of action for fraud. There is conflicting authority on this issue. *See* the recent analysis in *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231 (S.D.N.Y. 2006). In view of the determination above that the Amended Complaint states claims that are collateral to the contract at issue, there is no need to decide this issue.

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power*, 227 F.3d 8, 20 (2d Cir. 2000); s*ee also Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996) (discussing the element of a "special relationship."). In assessing the existence of a duty arising out of a special relationship, courts consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 102-103 (2d Cir. 2001), citing *Kimmel*, 89 N.Y.2d at 264. The courts also considers whether the speaker was an educated professional in the field of his alleged misrepresentation, such as a doctor or a lawyer. *See JP Morgan Chase Bank v. Winnick*, 350 F.Supp.2d 393, 400 (S.D.N.Y. 2004) (citations omitted). Further, to determine whether there was a special relationship, a court considers whether there was privity of contract, or a relationship similar to privity, between the parties. *Id*. at 401. However, the alleged fraud cannot be the result only of a breach of a duty allegedly owed under a contract, which would run up against the "economic loss doctrine" and "transmogrify the contract claim into one for tort." *Id*.

11

Here, Defendants convincingly argue that there was no special expertise or relationship outside of the contract that could give rise to a special relationship between the parties. Although Actrade argues that HLC had special knowledge about the alleged invoice backdating, Actrade has not alleged that either HLC or Landau were experts in TAD programs; rather, Actrade alleges only that Defendants had "specialized knowledge" concerning the alleged misrepresentations. This fails to qualify as the type of special relationship that would support a claim of negligent misrepresentation because "knowledge of the particulars of the company's business -- and of the true situation underlying the misrepresentations pertaining to that business. . .does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context…" *JP Morgan Chase Bank*, 350 F. Supp. 2d at 402. Moreover, for Actrade to argue that the special relationship arose from the contract would merely "transmogrify the contract claim into one for tort." *Id*. at 401. Count Four should be dismissed.

## Conclusion

For the above reasons, HLC's Motion For Summary Judgment is denied except with respect to Count Four, which is dismissed. Actrade should settle an order on five days' notice and schedule a final pretrial conference to set a date for trial.

Dated: New York, New York
      February 5, 2007

                                      */s/ Allan L. Gropper*
                                    UNITED STATES BANKRUPTCY JUDGE